[Civ. No. 3639. Fourth Dist. June 27, 1947.]

SIEGEL DANIEL JONES, Appellant, v. REAL ESTATE COMMISSIONER OF THE STATE OF CALIFORNIA, Respondent.

O. E. Mark for Appellant.

Robert W. Kenny and Fred N. Howser, Attorneys General, Bayard Rhone and Ruth Bernfeld, Deputy Attorneys General, for Respondent.

BARNARD, P. J.—This is an appeal from a judgment denying a petition for a writ of mandate.

The appellant was, and for many years had been, a licensed real estate broker. He was the equitable owner of three lots in San Diego, on which were several small houses. He agreed to sell a part of one lot, with a house thereon, to two purchasers through an escrow agreement made with a title company on May 4, 1944.

There was a delay in closing the escrow and transferring title to the purchasers and on February 9, 1945, the respondent notified the appellant to appear and show cause why his broker's license should not be suspended or revoked. The charges specified were that the appellant had represented to these purchasers that he was the owner of the property, that the property was free of incumbrance except for a loan which could be paid off at any time, and that he could and would pay

off this loan within a few days and could and would transfer title to these purchasers upon payment by them of $1,425; that these representations and promises were false and known by him to be false; and that although the purchasers had paid the $1,425 in reliance upon these representations and promises the appellant had failed and refused to furnish a grant deed. It was charged that these misrepresentations constituted a violation of section 10177(f) of the "Real Estate Law," and further charged that by offering to sell or lease portions of these three lots without notifying the commissioner the appellant had also violated section 11010.

The hearing on these charges was begun on February 28, 1945, and was continued to April 10, 1945. In the meantime, and on March 17, 1945, the escrow was closed and the property here in question was conveyed by grant deed to the purchasers. On May 31, 1945, the respondent made his findings and order. It was found that the facts as set forth in the charges were true, and that by reason thereof the appellant had violated sections 10177(f) and 11010 of division 4 of the Business and Professions Code. The order was that the appellant's license "for the year 1944-45 be and the same is hereby REVOKED; that said order is made without prejudice to the filing of an application by respondent for a real estate broker license for the year 1945-46."

On June 13, 1945, relying upon the "without prejudice" clause of this order, the appellant applied for the regular annual renewal of his license and paid the renewal fee. On August 3, 1945, he was notified by the commissioner that he would be considered as an original applicant, and that it would be necessary for him to file such an application and to pay an additional $15 as an examination fee.

On August 20, 1945, he filed in the superior court a petition for a writ of mandate seeking to compel the respondent to reinstate his broker's license for the year 1944-45 and to renew the same for the year 1945-46, with a further prayer for declaratory relief by way of an interpretation of the ambiguities in the respondent's order of revocation. After a trial, the court found that there was evidence which was sufficient to support the findings, conclusions and order of the respondent in revoking the appellant's license, that the appellant was guilty of violating section 10177(f) of the Business and Professions Code, that he was not guilty of violating section 11010 of that code, and that the charge of

violation of the latter section had been abandoned by the respondent. (The abandonment of the charge of violating section 11010, and the court's finding with respect to that charge, were caused by the ruling in *People* v. *Embassy Realty Associates*, 73 Cal.App.2d 901 [167 P.2d 797], which was decided while the proceeding before the superior court was pending.) A judgment was entered accordingly and this appeal followed.

Appellant's main contention is that there is no evidence which may be regarded as sufficiently substantial to support the commissioner's findings and conclusions, upon which the order solely rests, to the effect that he violated section 10177(f) by knowingly making false representations, in the sale of this property, which were relied upon by these two purchasers. We think this contention must be sustained. In fairness to the respondent, it should be said that it seems probable from the record that the order in question would not have been made except for the fact that the commissioner then thought that the subdivision provisions of section 11010 had also been violated, which later turned out to be an erroneous conclusion.

A brief statement as to how this appellant acquired an interest in the three lots, a part of which was sold to these purchasers, is necessary for an understanding of the problem here presented. In 1938, Western Loan and Building Company entered into a contract with a Mr. and Mrs. Nelson for the sale of these three lots upon monthly payments covering the balance due. In 1940, the Nelsons put a grant deed of this property to one Bonham in escrow with a title company in San Diego, with instructions that on payment to them of $1,100 the deed was to be delivered to "S. D. Jones or order," but not until a deed could be procured from Western Loan and Building Company and their demand satisfied. The appellant placed $1,100 in this escrow on November 15, 1940, and the Nelsons were paid in full for their interest in the property. The Nelsons had also given an assignment of their contract to the appellant, although it later turned out that it was not in proper form to satisfy the Western Loan and Building Company. In the spring of 1941, Bonham, for some reason, refused to go on with the purchase of the property and dropped out, leaving the appellant, who had paid the Nelsons in full, obliged to continue as vendee under the contract. This he did, making the payments regularly. In 1942, the

appellant contacted Western Loan and Building Company with reference to paying off "the loan" and the loan company agreed that it would accept the balance due.

In 1944, the appellant agreed to sell a part of the property, with one house, to the two purchasers above referred to. These purchasers agreed to pay $2,850 for the property, paying $1,425 cash and giving a trust deed for the balance to the appellant. This involved paying off the Western Loan and Building Company and getting a deed from it. The purchasers wanted the deal put through an escrow with the title company and this was done, the escrow agreements being dated May 4, 1944. The escrow agreement signed by the two purchasers provided that the $1,425 paid by them into escrow could be used when title to the property they were buying could be shown to be vested in them, subject to the trust deed they were giving. The date on which the escrow should be completed was left blank, and the escrow agreement contained a further provision requiring the escrow agent to complete the escrow "at the earliest possible date thereafter, unless I shall have made written demand upon you for the return of all instruments deposited by me."

A delay of some months occurred in closing the escrow. There was no difficulty with Western Loan and Building Company. It wanted its money, which it had agreed to accept, and it accepted it and furnished a deed which enabled title to be vested in the two purchasers. Some delay was caused by the refusal of the Nelsons to correct their signatures and something in the form of the assignment they had previously given to the appellant. In order to correct this the appellant filed suit against the Nelsons in November, 1944, which was promptly settled and a proper conveyance was given by the Nelsons. It appears that most of the delay was caused by an employee of the title company handling the escrow, who allowed weeks to go by without sending for required papers, who assertedly waited for information when the information had already been furnished, and who was also hampered by illness. It clearly appears that if the escrow agent had acted with any degree of promptness after the matter with the Nelsons was straightened out, the deed from Western Loan and Building Company would have been secured long before these charges were brought against the appellant by the respondent. Finally, on March 3, 1945, the appellant secured a change of the escrow to another title com-

pany, whereupon a deed was secured from Western Loan and Building Company and a clear title given to the purchasers within two weeks.

It is in the light of this general situation that the specific charges, upon which the revocation of this license is based, must be considered. It was charged and found by the respondent that in selling this property to these two purchasers the appellant knowingly and falsely represented to them (1) that he was then the owner of the property; (2) that the property was free from incumbrance except for a loan which could be paid off at any time; (3) and that he could and would pay off this loan within a few days, and could and would transfer title to these purchasers on payment by them of the sum of $1,425. It was further found that the purchasers paid this amount in reliance upon these representations and promises, which were false and known by the appellant to be false. In support of the findings, on the original hearing and by the court, the respondent contends that it appears from the facts above stated that the appellant was not the legal owner of the property, and that the incumbrance thereon was not a "loan" but was in the form of a contract of purchase and sale; that the appellant could not have legally compelled the Western Loan and Building Company to accept the full amount of the unpaid purchase price; that on May 4, 1944, the Western Loan and Building Company had not yet approved the assignment from the Nelsons to the appellant; and that the two purchasers testified that the appellant told them that he was the owner of the property, that there was a loan on the property which he could pay off right away, and that it would take 30 to 60 days and not over 60 days to bring the title down. And further, that he told them "If we wanted to pay this half he would go ahead and clear up the loan on it and give us our deed," and that they went into the escrow in reliance on those representations and promises.

The evidence is clearly insufficient to sustain the first charge that the appellant knowingly and falsely claimed to be the owner of this property. He had bought the interest of the Nelsons as vendees in the contract of sale and had paid the Nelsons in full. He had an assignment of their interest, and had assumed the burden of the contract and kept up the payments for several years. The fact that he later discovered that there was a slight flaw in the form of his assignment, and had to secure a corrected assignment, is not material. The

Western Loan and Building Company had accepted payments from the appellant for years, and it never objected to the fact of an assignment to him of the Nelsons' interest, but merely wanted to be sure the form was sufficient to protect it in giving a deed to the appellant. Not only was he the equitable owner, and what is ordinarily considered the actual owner, during all of the time here in question, but there is nothing in the evidence which even tends to support the charge that he knew at the time that he was not such an owner, or that he knowingly made a false claim to ownership.

■ The charge that the appellant, in talking to the two purchasers, wrongfully and unfairly spoke of the incumbrance as a loan when in fact it was a contract of purchase and sale is technical in the extreme. The contract of purchase, in which the appellant succeeded to the rights of the vendees, came from a loan company and it is more than probable that the loan company's title was originally derived through a loan. In any event, the officers of that company spoke of it as a loan and expressed a desire to have it liquidated. The loan company had previously told the appellant that they would accept the full amount due, and had intimated that they would be glad to have it at any time. There is not sufficient evidence of known falsity or unfair dealing in that representation, if made, to justify a revocation of this license.

■ With respect to the claimed representations that the appellant could and would pay this loan within a few days, that he could and would transfer title upon payment of the $1,425, and that it would take from 30 to 60 days to bring down the title and complete the transaction, a number of things should be said. There is not a particle of evidence to indicate that he did not fully believe that he could pay off this incumbrance within a few days, and none to indicate that he did not intend to do so. He had been told by the loan company that it was willing to take the balance due, the loan company did take it as soon as the papers were prepared, and he was at all times trying to get the deal closed and the loan paid. It conclusively appears that the purchasers agreed to pay $1,425 down in order to enable the appellant to pay the entire balance to Western Loan, since this was necessary in order to secure a deed to the part they were buying. The charge that he represented that he would transfer title to these purchasers upon payment of $1,425 is not intended strictly in that form, as it clearly appears that it was agreed that the deal should go

through escrow, and then upon the giving of a trust deed securing the balance. The charge that the appellant represented that title could be brought down and the escrow completed in from 30 to 60 days is an expression of opinion rather than a representation as to a fact. There is no evidence to indicate that the appellant knew in advance that this could not be done or that he even falsely expressed such an opinion. It clearly appears that he thought this could be done, that the delay was caused by matters which the appellant could not well have anticipated, that most of it was not his fault, and that at all times he desired to get this deal closed and was trying to do so. He certainly cannot be charged with advance knowledge that it would be necessary to change title companies, in order to get a simple thing done. Moreover, the purchasers' testimony that they implicitly relied on his representation that the deal could be closed within 30 to 60 days is not to be taken seriously in view of their own signed contract. The escrow agreement which they signed on May 4, 1944, not only left blank the date when the escrow was to be completed but instructed the escrow agent that in the event ''the conditions of this escrow have not been complied with at the expiration, of the time provided for herein'' the escrow agent was instructed to complete the same ''at the earliest possible date thereafter,'' unless written demand to the contrary was made. Not only had these purchasers agreed in writing to such an extension as was here required to complete this transfer but when the purchasers, who had taken possession of the house and who were refusing to pay their share of the taxes and of the water, complained to the appellant that the transfer of title was taking too long he offered to return their money and abandon the deal, which offer they refused.

Not only is the evidence here insufficient to show such dishonesty or unfair dealing as is contemplated by section 10177(f) of this code, but it clearly appears that the real complaint which gave rise to these charges was the delay of several months in completing this escrow. Not only does it appear that there was no intent on the part of the appellant to cause this delay and that its happening or probability was not known to him in advance but the two purchasers had, in the written escrow agreement, agreed in effect that the time for closing the escrow could be extended beyond the 30 or 60 days it is claimed the appellant represented as sufficient, and this extension was actually in force until after these charges

were filed and until the escrow was actually completed and title passed, which was some six weeks before the order of revocation was made.

It further appears that even on the original theory, when the matter of the subdivision of these three lots was still in the case and was regarded as a violation of section 11010, the respondent regarded the supposed dereliction of the appellant as being slight, as shown by the order made. With the matter of the subdivision section out of the case a further deficiency appears. Not only is the order, as made, rather ambiguous as shown by the fact that it took the respondent's office some seven weeks to determine what kind of an application for license the appellant was entitled to make, but that order is to a considerable extent inconsistent in itself in that it seems to find that the same facts were sufficient to show the dishonesty or unfair dealing which would warrant the denial of an application, under section 10177(f), while at the same time finding and ordering that these facts were not sufficient to warrant the denial of such an application which the appellant was invited to make within a few days.

The work of respondent's office is too important and its results too valuable to allow that work to be discredited and perhaps permanently injured by permitting such an order, on such evidence, to stand as representing the real intentions or policy of that department in the conduct of the important duty with which it is charged. The beneficial effects of this legislation will best be preserved if the needed power of revocation is used only in reasonably justifiable cases and if occasional errors, whether arising from inadvertence or from excessive zeal, are corrected before it is too late.

The judgment is reversed with directions to issue the writ as prayed for.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing was denied July 17, 1947.